# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NANCY LOTT, | ) | |
| | ) | No. 11 CV 5632 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | November 30, 2012 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Nancy Lott claims that she is disabled by a combination of diabetes-related symptoms, kidney dysfunction, carpal tunnel syndrome, hearing and vision problems, depression, and headaches. In 2009 she applied for disability insurance benefits ("DIB"), 42 U.S.C. §§ 416(i), 423, but the Commissioner of Social Security Administration ("Commissioner") denied her application. Currently before the court is Lott's motion for summary judgment challenging the denial of benefits. For the following reasons, her motion is denied:

### Procedural History

Lott filed her application for DIB in February 2009, claiming that her physical and mental impairments have prevented her from working since December 17, 2008. (Administrative Record ("A.R.") 115.) The Commissioner denied her claims initially and on reconsideration. (Id. at 57-58.) Lott then requested, and was granted, a hearing before an administrative law judge ("ALJ"). After considering Lott's testimony and medical evidence, the ALJ concluded that she is not disabled as defined in the Social Security Act.

(Id. at 19.)   When the Appeals Council denied Lott's request for review, (id. at 1-3), the ALJ's decision became the final decision of the Commissioner, *see Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).   On August 17, 2011, Lott filed the current suit seeking judicial review of the ALJ's decision.   *See* 42 U.S.C. § 405(g).   The parties have consented to the jurisdiction of this court.   *See* 28 U.S.C. § 636(c).

## Facts

Lott claims that she has been disabled since December 2008, when she was laid off from her long-standing job as a secretary.   According to Lott, her vision and hearing problems led her to make "critical mistakes" at work even before she was laid off, (A.R. 41), and she is unable to work now because of the combination of those problems and carpal tunnel syndrome, depression, headaches, kidney dysfunction, and symptoms related to diabetes.   Lott presented both documentary and testimonial evidence in support of her claim at her hearing.

## A.      Medical Evidence

Lott, who is 57 years old, was diagnosed with diabetes in 1976, (A.R. 155), and received a successful kidney and pancreas transplant in September 2001, (id. at 342).   Since then, she travels 240 miles from her home in a Chicago suburb to the University of Iowa Hospital for annual follow-up visits.   (Id. at 339, 342.)   At her October 2007 follow-up her physician wrote that Lott "has no specific symptoms related to her renal transplant," but noted that she had broken some of her toes and an ankle and had experienced recurring urinary tract infections ("UTIs").   (Id. at 339.)   At her October 2008 follow-up her doctor

noted that she had not had any bone fractures or UTIs since her last visit and reported that they would continue to monitor her renal and pancreatic endocrine function at regular intervals. (Id. at 342, 344.) But in August 2009 Lott reported having UTIs with increasing frequency in the previous two years, with symptoms including increased urinary frequency and urgency. (Id. at 529.) Lott underwent an ultrasound which revealed moderate hydronephrosis, but her physician, Dr. Mohammed Ahmed, noted that her condition did "not require any further workup or intervention." (Id. at 567.) In September 2009 Lott underwent a cystoscopy which "was completely unremarkable," and an ultrasound "that did not show anything of concern, including masses or significant hydronephrosis." (Id. at 637, 640.) At her April 2010 follow-up, Lott was "happy to report that she has had zero infections" in the previous seven months. (Id. at 640.)

With respect to Lott's complaints of headaches, the record shows that Lott was examined by a neurologist, Rodrigo Ubilluz, in January 2007 who noted that her headaches were at a level of about 5 out of 10. (Id. at 354.) In June 2008 Dr. Ubilluz noted that he had not seen Lott in a year, and that despite her reports of weekly headaches, she wished to continue with the same medications. (Id. at 352.) Six months later Dr. Ubilluz reported that Lott had been doing "quite well" with respect to her headaches, which she reported having about twice a week. (Id. at 351.) Dr. Ubilluz wrote that Lott's headaches "are not very intense" and that her migraine medications were working "remarkably well." (Id.) Lott also brought her headache complaints to a chiropractor, Robert Sheng, who treated her with acupuncture and exercises. (Id. at 359-60.) In December 2008 Dr. Sheng described her

headaches as "much improved." (Id. at 360.) Lott reported an uptick in the frequency of her headaches in December 2010, but Dr. Ubilluz wrote that she had stopped taking her headache medicine. (Id. at 617.)

The record also documents Lott's recurrent ear infections and associated hearing difficulties. In June 2003 Lott saw Dr. Oscar Alonso regarding her complaints of hearing loss and tinnitus. (Id. at 254.) His examination revealed right otitis media with effusion—in other words, fluid behind the eardrum—but no sign of nasopharyngeal pathology. (Id.) Dr. Alonso prescribed medicine to combat her seasonal allergies and suggested that she might benefit from having an ear tube placed in her right ear. (Id.) A year later Lott presented with ear pain and Dr. Alonso reiterated his opinion that she might benefit from ear tubes. (Id. at 257.) In September 2004 Lott underwent the ear-tube surgery and at a follow-up in October, Dr. Alonso described her examination as "essentially normal." (Id. at 261.) A year and a half went by before Lott next saw Dr. Alonso—he described her as being "lost to follow-up"—at which point he described her eardrums as normal. (Id. at 262.) Another year later, in February 2007, Lott returned to Dr. Alonso complaining of decreased hearing. (Id.) He diagnosed an ear infection which he treated with antibiotics. (Id.) The next month Lott underwent an audiogram which showed "a mild to severe mixed hearing loss in the right ear and a severe to profound mixed hearing loss in the left ear." (Id. at 263.) Lott had yet another ear-tube procedure in early 2007, after which her hearing was much improved and Dr. Alonso again described her examination as normal. (Id. at 264.) When Lott presented in the fall of 2007 with yet another ear infection, Dr. Alonso performed a third ear-tube

insertion.  (Id. at 265.)  She continued to see Dr. Alonso into the summer of 2009, who noted that future ear-tube surgeries may be necessary.  (Id. at 477.)

With respect to her vision issues, in the spring of 2007 Dr. Aaron Weinberg examined Lott and noted that her visual acuity was 20/40 in one eye and 20/70 in the other.  (Id. at 411.)  He noted that Lott underwent eye surgery in 1998 and wrote that she described her vision as "stable to somewhat improved" since undergoing surgery. (Id.)  In November 2007 Dr. Weinberg re-examined Lott and reported her visual acuity as being 20/25 on one side and 20/70 on the other.  (Id. at 412.)  He described her condition as stable and suggested that they continue to observe her conservatively.  (Id.)  A year later, in the fall of 2008, Dr. Weinberg rated Lott's visual acuity as 20/30 on one side and 20/100 on the other and again described her condition as "stable."  (Id. at 413.)  In April 2009 Dr. Weinberg submitted an eye report to the state disability agency opining that Lott has the unlimited ability to read fine print, drive safely, and avoid common hazards in the workplace.  (Id. at 409.)  He reported that Lott would only have the occasional ability to perform activities that require good hand/eye coordination, but the continual ability to perform activities that require good distant, detailed vision.  (Id.)  Lott next saw Dr. Weinberg in August 2010, who once again described Lott's condition as "stable" and suggested that they "continue to observe her retinal findings conservatively."  (Id. at 630.)

Lott also presented evidence documenting her complaints of carpal tunnel syndrome and leg pain.  She suffered a stress fracture in her ankle in August 2007 after which she underwent physical therapy.  (Id. at 421, 428.)  She has ongoing problems with her feet and

underwent debriding of her toenails. (Id. at 425.) In October 2007 her physical therapist reported to her doctor that Lott reported "feeling much better" and no longer experiencing "any type of discomfort in the lower leg." (Id. at 434.) With respect to her carpal tunnel syndrome, in June 2008 Dr. Ubilluz noted that Lott had pain in her right wrist and trouble typing and picking things up. (Id. at 352.) In October 2009 examining physician Dr. Ravikiran Tamragouri reported that Lott's "ability to grasp and manipulate with each hand is normal," although she complained of difficulty turning door knobs and picking up small objects from a tabletop because of a "glove type of numbness." (Id. at 574.) Dr. Ubilluz wrote in December 2010 that Lott was experiencing "problems" in her hands, noting that she has left-hand weakness and atrophic muscles in both hands. (Id. at 617.)

Lott underwent a psychological evaluation in October 2009 in connection with her disability claim. The examining psychologist reported that although her thought process was logical and she did not give any signs of psychosis, Lott meets the criteria for generalized anxiety disorder and moderate depression. (Id. at 578.) A reviewing psychiatrist noted that Lott has poor memory and is easily distracted, and opined that she has moderate limitations in activities of daily living, social functioning, and concentration, persistence, or pace. (Id. at 581, 591, 593.) The psychiatrist commented that Lott "is limited to simple routine tasks." (Id. at 597.)

In June 2009 reviewing physician Dr. Frank Jimenez completed a physical residual functional capacity ("RFC") assessment form. (Id. at 448-55.) He opined that Lott can sit, stand, or walk with normal breaks for about six hours in an eight-hour day. (Id. at 449.) He

found that she has no manipulative, visual, or hearing limitations. (Id. at 451-52.) A second reviewing physician, Dr. David Bitzer, reviewed Lott's file in November 2009 and confirmed Dr. Jimenez's assessment of her ability to sit, walk, and stand and her capacity to hear and see. (Id. at 600, 602-03.) Dr. Bitzer described Lott as being limited in handling and fingering because of "glove like numbness in bilateral hands." (Id. at 602.)

## B.     Lott's Hearing Testimony

At her September 2010 hearing before an ALJ, Lott described her past and current work histories. She explained that she worked as a secretary until she was laid off in December 2008 because "[b]usiness was slow." (A.R. 30, 41.) But Lott said that before she was laid off she was "making critical mistakes" at work because of her hearing and vision problems. (Id. at 41.) In 2010 she began working part-time as a companion to a visually impaired person, after finding and applying for the job online. (Id. at 29, 31.) In this companion role Lott keeps her client company, helps her to organize her shoes and earrings, and helps her "do her nails." (Id. at 29-30.) Although Lott occasionally does errands like picking up her client's prescriptions, for the most part they just sit together and talk or go for walks "up and down the block." (Id. at 31.) Lott testified that she does not think she can walk farther than that. (Id. at 35.)

Lott also described the symptoms stemming from her history of diabetes. She explained that she has been diabetic since she was a teenager, which has impacted her eyesight and her kidneys. (Id. at 32.) She said that her medications give her bouts of diarrhea and that she suffers from nephrosis, a condition that causes urine to flow back into

her kidneys and results in frequent urinary tract infections. (Id.) That condition also causes her to urinate frequently, requiring her to take five-minute breaks about once an hour. (Id. at 46.) She also has daily headaches that force her to nap in the late mornings. (Id. at 33.) Medication sometimes helps with the headaches, but about once every week or two Lott has a migraine that lasts for half a day, during which she "just can't do anything." (Id. at 47.) Lott's vision and hearing have also suffered. She had a torn retina that had to be reattached, and now she experiences "floaters," which are "like a big mass that floats around my eyes," making it difficult for her to see beyond "images and silhouettes." (Id. at 42.) She said that she has nerve damage in her left ear that causes her to have hearing problems, although she does not use a hearing aid. (Id. at 46.)

Lott also described the limitations caused by carpal tunnel syndrome and bad knees. She said that she wears splints on her wrists and that she has problems zipping or buttoning her clothes or tying her shoes. (Id. at 34.) The carpal tunnel syndrome also makes it difficult for her to write or pick things up. (Id.) Lott explained that she has not had any surgery to treat her carpal tunnel syndrome because she "can't afford anything" given her $5,000 insurance deductible. (Id. at 41.) Lott further testified that her left knee "gives out a lot," but that she does not have the money to pay to have it tested. (Id. at 36.) She does not use a cane, but she has trouble navigating stairs or getting up off the floor. (Id.) She also has osteoporosis, which led to her breaking an ankle. (Id. at 47.)

Lott described herself as being depressed and suffering from low self-esteem. (Id. at 34-35.) She has a history of hallucinations and suicidal thoughts, but does not have those

thoughts as much anymore. (Id. at 43.) Lott also described herself as feeling hyperactive and struggling to finish things because she is too distracted. (Id.) About twice a week she has crying spells that last for three or four hours. (Id. at 35.) Her urologist prescribes her an anti-depressant which helps "somewhat" to alleviate the symptoms, but she still feels depressed and paranoid. (Id.) She only sleeps for about five hours each night because she is too anxious to sleep. (Id. at 37, 44-45.) But she gets along with other people and socializes with a friend, who takes her to church and out to dinner every Saturday afternoon, and occasionally to a show. (Id. at 39-40.)

Lott testified that she has never had to cancel any of her companion shifts because of her kidney-related symptoms and that she is able to drive on clear days. (Id. at 33, 38.) She explained that she has no difficulties with personal hygiene or with preparing meals for herself. (Id. at 37.) She also does chores like loading and unloading the dishwasher, doing laundry, and making her bed, although her daughter does the rest of the house cleaning. (Id. at 37-38.) For entertainment, Lott crochets for 15-minute interludes, listens to music, reads the newspaper, and watches television. (Id. at 39-40.) About two or three times a week she uses her brother's computer to check her email. (Id. at 40.)

**C.      The ALJ's Decision**

After considering the proffered evidence, the ALJ concluded that Lott is not disabled. In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520(a)(4), which requires her to analyze:

(1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)).  If at step three of this framework the ALJ finds that the claimant has a severe impairment which does not meet the listings, she must "assess and make a finding about [the claimant's RFC] based on all the relevant medical and other evidence."  20 C.F.R. § 404.1520(e).  The ALJ then uses the RFC to determine at steps four and five whether the claimant can return to her past work or to different available work.  *Id.* § 404.1520(f), (g).  It is the claimant's burden to prove that she has a severe impairment that prevents her from performing past relevant work.  42 U.S.C. § 423(d)(2)(A); *Clifford*, 227 F.3d at 868.

Here, the ALJ determined at steps one and two of the analysis that Lott has not engaged in substantial gainful activity since December 17, 2008, and that her carpal tunnel syndrome constitutes a severe impairment.  (A.R. 13.)  She acknowledged Lott's diabetes-related symptoms, vision and hearing issues, headaches, leg pain, and depression, but found that none of these impairments qualifies as severe.  (Id. at 13-14.)  At step three the ALJ determined that Lott's impairment or combination of impairments neither meets nor medically equals any of the listings.  (Id. at 14-15.)

Proceeding to the next step of the analysis, the ALJ determined that Lott has the RFC to perform light work except that she "is limited to frequent use of her hands to handle,

finger, and feel." (Id. at 15.) In explaining her conclusion, the ALJ noted that Lott had not seen her neurologist regarding her carpal tunnel syndrome symptoms since 2008, and that her chiropractor had described her as having a full active range of motion in her wrists and fingers. (Id. at 17.) The ALJ found suspicious that Lott's disability onset date coincides with the date on which she was laid off from her job for business reasons. (Id.) The ALJ saw "no evidence of a significant deterioration in the claimant's medical condition since that layoff." (Id.) The ALJ also discounted Lott's credibility because Lott testified that she applied for state unemployment benefits after her disability onset date. (Id. at 18.) The ALJ noted that applicants for those benefits typically must affirm that they are capable of working—an affirmation that would be inconsistent with the claims Lott made in connection with her DIB application. (Id.) The ALJ wrote that Lott's vision problems appear to be stable and that they do not prevent her from doing things like reading, driving, and using a computer. (Id.) She rejected the consulting psychiatrist's characterization of Lott as having moderate limitations in certain domains, concluding that the opinion is inconsistent with Lott's own description of her daily activities and part-time work. (Id.)

Having concluded that Lott retains an RFC for light work, the ALJ determined that she is capable of returning to her past relevant work as a secretary. (Id. at 19.) Accordingly, the ALJ concluded that Lott is not under a disability as defined by the Social Security Act, and denied her application for DIB. (Id.)

**Analysis**

In moving for summary judgment Lott argues that this court should reverse the ALJ's decision to deny her DIB application because, according to her, the ALJ's RFC assessment was improper and her credibility determination unsupported. This court reviews the ALJ's decision only to ensure that it is supported by substantial evidence, *see* 42 U.S.C. § 405(g); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971). That standard of review precludes this court from conducting its own analysis of whether the claimant's impairments are disabling or from reweighing the evidence, resolving conflicts in the record, or making independent credibility assessments. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Instead, this court is tasked with ensuring that the ALJ adequately discussed the issues and built the requisite "logical bridge" between the evidence and her conclusion. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011).

Lott's main contention in challenging the ALJ's RFC assessment is her argument that the ALJ did not provide a narrative discussion that sufficiently explains how the evidence supports her conclusion that Lott can perform sustained work activities during an ordinary work week. She faults the ALJ for not providing a "function-by-function assessment of Lott's work-related abilities." (R. 19, S.J. Mem. at 8.) The social security regulations require that the ALJ include in the RFC assessment "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). In other words, the "RFC assessment must include a discussion

of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Although the ALJ "has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of nondisability . . . an ALJ need not mention every piece of evidence, so long as he builds a logical bridge from the evidence to his conclusion." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Contrary to Lott's assertions, here the ALJ neither overlooked key evidence nor failed to provide the requisite narrative explanation. In fact, she thoroughly walked through the record evidence and explained why she did not find that Lott's impairments prevent her from working. The ALJ took into account Lott's daily activities, including her ability to drive, care for herself and her home, socialize, and work as a companion. (A.R. 16.) She observed that Lott has not sought treatment for her carpal tunnel syndrome since 2008 and that her chiropractor reported that she has a full active range of motion in her wrists and fingers. (Id. at 17.) The ALJ cited the evidence that shows that Lott's neurological and mental status evaluations are "within normal limits" and that her vision is stable. (Id. at 17-18.) The ALJ explained why she discounted a psychiatric review assigning her moderate limitations in some areas, noting that this opinion is inconsistent with Lott's own description of her ability to function on a daily basis. (Id. at 18.) She limited Lott's RFC to light work in deference to Lott's description of her carpal tunnel symptoms. (Id.) In all of these ways, the ALJ adequately matched up her assessment of Lott's RFC to the record and testimonial evidence. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (cited with approval in *Knox*

*v. Astrue*, 327 Fed. Appx. 652, 657 (7th Cir. 2009) (noting that a narrative discussion of a claimant's symptoms and the medical evidence adequately explains the basis of an RFC assessment)); *Wurst v. Astrue*, __ F.Supp.2d __, 2012 WL 1952630, at *9 (N.D. Ill. May 30, 2012) (noting that the social security regulations require the ALJ "to consider, not articulate, the RFC on a function-by-function basis").

Lott also argues that the ALJ did not sufficiently assess the impact that the combination of Lott's carpal tunnel syndrome and her other impairments—including fatigue, hearing and vision loss, and the side effects of her medication—would have on her capacity to work. It is true that an ALJ is charged with considering "the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment." *Denton*, 596 F.3d at 423; 20 C.F.R. § 404.1523. But the burden remains with the claimant to put forth medical evidence demonstrating how her non-severe impairments impact or exacerbate her disabling condition. *See Denton*, 596 F.3d at 424; *see also Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting that it is the claimant's burden to furnish medical and other evidence to establish the existence of a disabling condition). In her summary judgment motion, Lott does not explain how she thinks her combination of impairments prevent her from sustaining an RFC for light work, or even cite to any evidence that she thinks the ALJ should have considered but overlooked. Given Lott's failure to explain what evidence the ALJ should have considered but ignored, and in light of the ALJ's explanation that she had considered "the objective medical record as a whole" and "all symptoms . . . to the extent to which [they] can reasonably be accepted as consistent with the

objective medical evidence," Lott has not shown that the ALJ's consideration of the evidence was inadequate. *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (upholding ALJ's consideration of combination of impairments where ALJ "stated that he had considered all of [the claimant's] symptoms together, along with the objective medical evidence").

Next Lott faults the ALJ for finding that her daily activities are consistent with an RFC for light work without analyzing in detail how those activities equate with competitive employment. Specifically, she argues that "[h]ousehold chores and the minimal activity testified to by Lott regarding her companionship duties (sitting mostly) do not appear to equate with competitive employment." (R. 19, S.J. Mem. at 9.) A claimant's daily activities are among the factors that an ALJ is authorized to take into account in crafting the RFC. *See* SSR 96-8p, 1996 WL 374184, at *5. In analyzing the claimant's daily activities, an ALJ must be careful not to casually equate "household work to work in the labor market," and should be mindful that "[a] person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working." *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005). But here, Lott's daily and work activities were among many factors that the ALJ considered in assessing her RFC, along with the objective medical evidence and RFC evaluations submitted by consulting and examining physicians. (A.R. 16-19.) And more importantly, the ALJ explained why she believes that Lott's activities are consistent with an RFC for light work. She explained that Lott's testimony that she is able to read, drive, watch tv, use a computer, and work as a companion all support the finding that her vision problems would

not interfere with full-time work.  (Id. at 18.)  The ALJ noted that Lott's ability to paint her client's nails, organize things, crochet for 15-minute intervals, and perform tasks like housework and cooking suggest that her carpal tunnel syndrome is not so severe as to preclude light work.  (Id.)  She also pointed out that any limitation in social functioning or daily activities would be inconsistent with Lott's own description of her social activities and ability to care for herself.  (Id.)  And the ALJ was entitled to rely on Lott's part-time job as evidence that her impairments do not limit her as much as she testified.  *See Williams-Overstreet v. Astrue*, 364 Fed. Appx. 271, 277 (7th Cir. 2010).  Because the ALJ properly considered Lott's daily activities as one factor among others, and adequately explained why she determined that those activities are consistent with an RFC for light work, a sufficient logical bridge is in place to support the ALJ's findings.  *Denton*, 596 F.3d at 425.

Lott also accuses the ALJ of "playing doctor" by writing that her "chronic tinnitus" is not severe.  (R. 19, S.J. Mem. at 9.)  According to Lott, this statement shows that the ALJ determined the RFC "based on her own hunches," and constitutes a "false reference" because she has eustachian tube dysfunction, not tinnitus.  (Id.)  As an initial matter, Lott's own physician referred to her condition as "tinnitus," (A.R. 254), so contrary to Lott's assertion, the ALJ's use of that term is supported by the record.  And while an ALJ is not permitted to play doctor in the sense that she may not rely on assumptions or her "own independent medical conclusion," *see Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009), an ALJ does not play doctor where her determinations are supported by the record evidence and testimony, *see Hopgood v. Astrue*, 578 F.3d 696, 702 (7th Cir. 2009).  Here, the ALJ

explained that she did not find Lott's hearing issues to be severe because she does not require the use of hearing aids and she is able to drive and work as a companion. (A.R. 14.) On top of this record evidence, the ALJ noted that she did not perceive Lott as having any trouble communicating during the hearing. (Id.) Notably, Lott has not pointed to any evidence that contradicts the ALJ's assessment. Because the ALJ's assessment of Lott's hearing issues is grounded in record evidence rather than speculation, this court finds that there is no freestanding medical conclusion here that would justify a remand. *See Hopgood*, 578 F.3d at 702.

Moving on to the ALJ's credibility assessment, Lott argues that the ALJ committed reversible error in relying on boilerplate that the Seventh Circuit has criticized and by failing to sufficiently explain why she found that Lott's description of her symptoms lacked credibility. This court will overturn an ALJ's credibility assessment only where the claimant shows that it is "patently wrong." *See Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012). The ALJ is required to consider the entire record in evaluating the claimant's credibility and to give specific reasons for the weight attributed to the claimant's testimony, but this court's role is simply to examine whether those reasons are supported. *See Shideler*, 688 F.3d at 310-311. "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006).

Lott rests the bulk of her credibility argument on the fact that the ALJ relied in part on boilerplate language that the Seventh Circuit has repeatedly criticized. Specifically, at the outset of her evaluation of the evidence the ALJ noted that:

> the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(A.R. 17.) As Lott points out, the Seventh Circuit has criticized this exact language as putting "the cart before the horse, in the sense that the determination of capacity must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion." *Filus*, 694 F.3d at 868; *see also Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012). But the Seventh Circuit has clarified that an ALJ's inclusion of this language is harmless where the ALJ "has otherwise explained his conclusion adequately," and has offered "reasons grounded in the evidence" for discounting the claimant's testimony. *Filus*, 694 F.3d at 868. That is exactly what the ALJ did here. The ALJ gave several well-supported reasons for finding Lott's testimony regarding her impairments to be less than wholly credible. She gave specific examples from the medical records to illustrate why she believes Lott's carpal tunnel and vision symptoms are less severe than Lott described. (A.R. 17.) She pointed out the inconsistency in Lott's testimony that she considers herself hyperactive, but spends most of her day sitting and relaxing. (Id. at 18.) The ALJ also detailed what she perceived as inconsistencies between Lott's allegations regarding her symptoms and her own descriptions of her daily activities,

including her ability to drive, crochet, use a computer, and take care of herself and her household.  (Id.)  And the ALJ found particularly telling that Lott's claimed disability onset date coincides with the date she was laid off from her last job for business reasons.  (Id. at 17-18.)  The ALJ noted that there is no record evidence suggesting that Lott's condition has deteriorated significantly in the time since she was laid off, and explained that "[t]he fact that the impairments did not prevent the claimant from working at that time strongly suggests that they would not currently prevent work."  (Id. at 18.)  Because all of these reasons are well-explained and grounded in the evidence, the ALJ's use of the boilerplate language here does not amount to reversible error.  *See Filus*, 694 F.3d at 868.

Lott faults the ALJ in particular for discrediting her complaints in part because Lott applied for unemployment insurance benefits after her alleged disability onset date.  The ALJ noted that "[i]n order to qualify for such benefits, applicants typically must affirm that they are capable of working."  (A.R. 18.)  The ALJ stated that claiming to be completely disabled from working at the same time she has certified her ability to work for another form of benefits "brings into question the reliability of the claimant's allegations generally."  (Id.)  The Seventh Circuit has held that an ALJ can take into account an applicant's certification that she is ready to work in connection with unemployment benefits when assessing her credibility with respect to her disability claims.  *See Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005); *see also Workman v. Commissioner of Social Sec.*, 105 Fed. Appx. 794, 801-02 (6th Cir. 2004).  In cases where the claimant testifies that she sought unemployment benefits out of financial desperation, however, the ALJ must recognize that "[a] desperate

19

person might force herself to work—or in this case certify that she is able to work—but that does not necessarily mean she is not disabled." *Richards v. Astrue*, 370 Fed. Appx. 727, 732 (7th Cir. 2010); *see also Wallace v. Astrue*, 11 CV 4350, 2012 WL 3598737, at *12 (N.D. Ill. Aug. 20, 2012).

In challenging the ALJ's decision to discredit her in part based on her unemployment application, Lott does not argue that she sought unemployment benefits out of financial desperation or otherwise explain why she sought unemployment benefits at a time during which she now claims she was disabled. Instead, she argues that the ALJ's credibility finding is unfair because "the ALJ is incompetent to adduce state law without proffering the actual citation to the specific law to which she is putatively alluding." (R. 19, S.J. Mem. at 11.) Notably, Lott does not deny that she certified that she is ready to work in her unemployment insurance application. And as the State of Illinois's handbook on unemployment insurance makes clear, an applicant for unemployment benefits "must be *able to and available for work* during any week" for which benefits are claimed. *See* Illinois Dep't of Employment Sec., *Unemployment Insurance Benefits Handbook* at 9, http://www.ides.illinois.gov/Custom/Library/publications/Publications/UnemploymentIns uranceBenefitsHandbook.pdf (emphasis in original) (last visited on November 28, 2012). Because Lott's unemployment benefits application is but one of several factors the ALJ cited to discount Lott's credibility, and because this and the other aspects of the ALJ's credibility assessment are sufficiently explained and supported, this court cannot say that the determination is "patently wrong." *See Filus*, 694 F.3d at 869.

## Conclusion

For the foregoing reasons, Lott's motion for summary judgment is denied, and the decision of the Commissioner is affirmed.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**